# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**JUSTIN GRANIER (#439048)**                          **CIVIL ACTION NO.**

**VERSUS**                                                        **18-901-BAJ-EWD**

**DARREL VANNOY**

## NOTICE

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the U. S. District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 14 days after being served with the attached report to file written objections to the proposed findings of fact, conclusions of law, and recommendations set forth therein.  Failure to file written objections to the proposed findings, conclusions and recommendations within 14 days after being served will bar you, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court.

ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.

Signed in Baton Rouge, Louisiana, on March 11, 2022

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

JUSTIN GRANIER (#439048)                              CIVIL ACTION NO.

VERSUS                                                18-901-BAJ-EWD

DARREL VANNOY

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before this Court is the application of Petitioner Justin Granier for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 and 2254.[1]  Following an evidentiary hearing, conducted on April 28, 2021,[2] to address the timeliness and merits of Petitioner's Claims 1 (juror bias) and 2 (prosecutorial misconduct), it is recommended that the application be denied as Petitioner has failed to establish the constitutional violations alleged.

I.      PETITIONER'S CLAIMS

Petitioner filed his federal habeas application on October 11, 2018, asserting the following claims: (1) his Sixth Amendment rights to a fair and impartial jury were violated because juror Gladys Mobley ("Juror Mobley") was biased due to her son's connection to the criminal investigation in the case, (2) his Fifth Amendment right to due process was violated because the state had actual knowledge that Juror Mobley's son had a connection to the investigation and engaged in prosecutorial misconduct when it failed to advise the trial court and the defense, (3) his Fourteenth Amendment due process rights were violated because the trial judge's improper comments during jury instructions led at least three jurors to believe that manslaughter was not an available responsive verdict, and (4) his trial counsel was ineffective for failing to object to inadmissible hearsay, which violated Petitioner's rights under the Confrontation Clause. Petitioner also requested an evidentiary hearing, which is styled as Claim 5.

---

[1] R. Doc. 1.

[2] R. Docs. 45 & 48.

After determining, on the face of the state court record, that Louisiana Supreme Court's decision dismissing Petitioner's juror bias (Claim 1) and prosecutorial misconduct (Claim 2) claims was contrary to clearly established federal law, this Court issued an *Order and Reasons* on December 30, 2020 granting Petitioner's request for an evidentiary hearing on Claim 1 and Claim 2.[3] At the evidentiary hearing held on April 28, 2021,[4] the parties were permitted to present evidence as to the timeliness and the merits of Claims 1 and 2.

## II.    FACTUAL BACKGROUND

The facts of the case, as described by the Louisiana First Circuit Court of Appeals ("First Circuit"), are as follows:

> On September 15, 2001, at about 5:30 a.m., two men approached Delaune's Supermarket in St. Amant, Ascension Parish, with the intent to rob a cashier. One of the men, armed with a 30-30 Marlin rifle, shot and killed Luke Villar, a Delaune's employee cleaning the parking lot. The same gunman then walked to the doorway of Delaune's and shot at Angelina Weber, an employee standing by the cash register. The two men then ran. Angelina survived, but sustained wounds to her head and arm caused by bullet fragments. Angelina was unable to identify the gunman. It did not appear any money was taken from the store.
>
> Based on an incident that had occurred at about 4:30 a.m. that same morning at a residence about a quarter mile from Delaune's, officers from the Ascension Parish Sheriff's Office brought Petitioner in for questioning, along with Lucas Roddy and Josh Barrow. Petitioner and Barrow gave statements admitting their involvement in the incident at Delaune's. Petitioner gave two separate statements to the police and testified at trial. Both statements were introduced into evidence at trial. In his first statement to the police, Petitioner said that he drove and Roddy and Barrow were passengers. After the three decided to rob Delaune's, Petitioner parked 100 to 200 yards away from Delaune's. Roddy and Barrow exited the car with guns, while Petitioner remained in the car. Petitioner heard gunshots, and moments later Roddy and Barrow got back in the car with their guns. Roddy said he shot someone, and he thought he killed him. Petitioner drove to the house of Nick Babin, a friend. Roddy and

---

[3] R. Doc. 20.
[4] R. Doc. 45.

Barrow removed their long sleeve shirts, and the Petitioner hid the clothing in Babin's barbecue pit.

In his second statement to the police, Petitioner said that he drove to Delaune's and parked about 50 yards away from there. Only Roddy was with Petitioner. Barrow was at Justin Smith's house.[5] Roddy exited the car with the 30-30 rifle, and the defendant exited the car with a loaded 20-gauge shotgun. According to Petitioner, the plan was to "tell everybody to stand back and get the money." When they got within ten to twenty feet of the employee (Villar) in the parking lot, Roddy shot him in the back. Villar fell, got up, and Roddy shot him again. Petitioner ran back to the car. Petitioner did not fire his weapon. Petitioner drove to Babin's house where he (Petitioner) and Roddy removed their long sleeve shirts. They hid the shotgun in the bushes outside and hid the 30-30 rifle underneath the back of Babin's house.

At trial, Petitioner testified that the first statement he gave to the police was true, and the second statement he gave to the police was false. According to Petitioner, the truth was that he did not get out of the car and that Roddy shot Villar. On cross-examination, Petitioner admitted: that he knew Roddy and Barrow were going to rob the store; that while he waited for them, Villar was killed; and that after he heard the gunshots, he waited in the getaway car until Roddy and Barrow returned, then drove away with them. Petitioner did not admit that he hid the guns.[6]

## III.   PROCEDURAL HISTORY - PETITIONER'S CONVICTION, DIRECT APPEAL, AND POST-CONVICTION PROCEEDINGS

On October 24, 2003, after a trial by jury, in the Twenty-Third Judicial District Court, Parish of Ascension, Petitioner was found guilty as charged of second-degree murder.[7] Petitioner was sentenced to life imprisonment without the benefit of probation, parole, or suspension of sentence on December 16, 2003.[8] Petitioner filed a direct appeal with the First Circuit after

---

[5] Fn. 1 of the First Circuit's opinion states, "This part of [Petitioner's] statement was determined to be false. Based on the investigation by the police, as well as Barrow's own statement to the police, it was clear that [Petitioner], Roddy, and Barrow were at Delaune's during the shooting." *State v. Granier*, 2007-0807 (La. App. 1 Cir. 12/21/07), 2007 WL 4480675.

[6] *State v. Granier*, 2007-0807 (La. App. 1 Cir. 12/21/07), 2007 WL 4480675.

[7] Petitioner was originally charged with first degree murder and attempted first degree murder on November 6, 2001. The first degree murder charge was amended to second degree murder on October 22, 2003.  R. Doc. 7, pp. 53-54; R. Doc. 7-1, pp. 85-86.

[8] R. Doc. 7-1, pp. 91-92.

receiving additional time on the grounds that his counsel failed to timely appeal despite Petitioner's instruction.[9] On December 21, 2007, the First Circuit affirmed Petitioner's conviction and sentence.[10] The Louisiana Supreme Court denied Petitioner's writ application on direct appeal on October 24, 2008.[11]

On March 26, 2009, Petitioner filed an application for post-conviction relief ("PCR application 1") in the trial court.[12] He asserted, *inter alia*, that the trial court's jury instructions created confusion which led jurors to believe they could not return a responsive verdict of manslaughter and that he received ineffective assistance of counsel because trial counsel's failure to object to hearsay testimony violated his rights under the Confrontation Clause. Petitioner's PCR application 1 was denied by order, dated September 7, 2011.[13] Petitioner's request for reconsideration on two of his claims was also denied by the trial court on September 13, 2011.[14] The notice from both orders is dated September 15, 2011.[15] Petitioner requested a return date from the trial court to file a writ with the First Circuit. The trial court order, signed September 27, 2011, set a return date "within the time delays provided by law."[16] On January 17, 2012, the First Circuit issued an order stating:

> WRIT DENIED ON THE SHOWING MADE. Relator failed to include a complete copy of his indictment, all pertinent minute entries, and other portions of the district court record that might support the claims raised in the application for postconviction relief.[17]

---

[9] R. Doc. 7-10, p. 35;62-66.
[10] R. Doc. 7-11, pp. 3-15.
[11] R. Doc. 7-11, p. 106.
[12] R. Doc. 7-12, pp. 1-69.
[13] R. Doc. 7-15, p. 47.
[14] R. Doc. 7-15, p. 54.
[15] R. Doc. 7-15, pp. 53, 55.
[16] R. Doc. 7-15, p. 131.
[17] R. Doc. 7-16, p. 2.

Petitioner filed a petition for a writ of certiorari with the Louisiana Supreme Court on February 9, 2012.[18] On October 8, 2012, the Louisiana Supreme Court summarily denied Petitioner's writ.[19]

On May 5, 2013, through counsel, Petitioner filed a second PCR application ("PCR application 2") in the trial court.[20] Petitioner re-raised the issue of juror confusion over the jury instructions, attaching affidavits from jurors attesting that they did not believe that manslaughter was a responsive verdict. Petitioner also raised the issue of juror bias for the first time. Petitioner alleged that he became aware on April 17, 2013, through an interview conducted by Petitioner's investigator, that Juror Gladys Mobley's son had a previously undisclosed connection to the criminal investigation that led to the charges against Petitioner. The trial court dismissed Petitioner's claim regarding juror confusion over the jury instructions as successive but ordered an evidentiary hearing on Petitioner's claim regarding Juror Mobley.[21]

Before the evidentiary hearing could be conducted, Juror Mobley died.[22] Because Juror Mobley was unavailable for the evidentiary hearing, Petitioner filed a motion seeking permission to use the investigator's hearsay testimony. On May 18, 2015, the trial court granted Petitioner's request to use hearsay testimony during the evidentiary hearing, finding the investigator's testimony qualified for exceptions to the hearsay rule found in Louisiana Code of Evidence articles 803 and 804.[23] The state sought a writ from this decision with the First Circuit. The First Circuit granted the writ on November 4, 2015, reversing the trial court's ruling on hearsay and remanding

---

[18] R. Doc. 7-16, p. 45.
[19] *State ex rel. v. Granier*, 98 So.3d 868; 2012-0386 (La. 10/8/12); R. Doc. 7-16, p. 60.
[20] R. Doc. 7-16, pp. 65-93.
[21] R. Doc. 7-17, pp. 23-26.
[22] R. Doc. 7-18. p. 22-23.
[23] R. Doc. 7-18, pp. 41-42.

for further proceedings.[24] The Louisiana Supreme Court denied Petitioner's writ application on this issue.[25]

An evidentiary hearing was conducted on November 2, 2017.[26] Samuel Mobley, Juror Mobley's son, testified. Wade Petite ("Petite"), Petitioner's trial counsel, also testified. During the state's questioning of Petite, the trial court expressed concern about whether the state knew during jury selection that Juror Mobley's son had a connection to the criminal investigation.[27] In response to an oral motion by Petitioner's counsel, the trial court ordered the state to produce any statements, reports, search warrants, and voluntary consents contained in the prosecution's files to search Samuel Mobley's parents' homes.[28] The trial court then recessed the hearing.

On December 4, 2017, in compliance with the trial court's order, the state produced Samuel Mobley's application for employment at Delaune's Supermarket.[29] The state also produced hand-written notes documenting an interview that police conducted of Mark Delaune ("Delaune"), the owner of Delaune's grocery store.[30] The notes indicated that Delaune identified Samuel Mobley as an employee who had been terminated. The production also included documentation from an interview with Samuel Mobley, including handwritten notations, that Mobley had been read his rights, Gladys Mobley is his mother's name, and Juror Mobley's address.[31] On December 11, 2017 the state filed a motion asserting an additional procedural objection that the state was materially prejudiced by the death of Juror Mobley such that Petitioner's application should be dismissed

---

[24] R. Doc. 7-19, p. 1.
[25] R. Doc. 7-19, p. 37.
[26] R. Doc. 7-19, pp. 117-139; R. Doc. 7-20, pp. 1-52.
[27] R. Doc. 7-20, pp. 38-51.
[28] R. Doc. 7-20, pp. 40-43.
[29] R. Doc. 7-27, pp. 105-106.
[30] R. Doc. 7-27, pp. 107-108.
[31] R. Doc. 7-27, p.107.

under Louisiana Code of Criminal Procedure article 930.8.[32] On December 12, 2017 the state filed another motion re-asserting their objection to the timeliness of Petitioner's application.[33]

Petitioner amended his PCR application 2 on December 14, 2017 and added a claim of prosecutorial misconduct for the state's failure to disclose Samuel Mobley's connection to the murder investigation during voir dire.[34] The state filed a motion to dismiss the prosecutorial misconduct claim on December 29, 2017.[35] The trial court denied the state's motions and ordered the state to answer Petitioner's prosecutorial misconduct claim.[36]

On January 19, 2018, the state filed a writ application with the First Circuit, seeking a writ of mandamus commanding the trial court to produce a return date and written reasons for the judgment denying the state's motions to dismiss.[37] The First Circuit denied the writ on February 1, 2018.[38] On February 7, 2018, the state filed a another writ application contending that the trial court erred when it failed to dismiss Petitioner's PCR application 2, erred when it allowed Petitioner to amend PCR application 2 to assert a claim of prosecutorial misconduct, and erred because it considered hearsay evidence.[39]

On February 14, 2018, while the state's writ application was pending, the state filed procedural objections to the prosecutorial misconduct claim, citing numerous articles from the Louisiana Code of Civil Procedure.[40] On March 7, 2018, the trial court denied the state's procedural objections.[41] The state then filed another writ application with the First Circuit, arguing

---

[32] R. Doc. 7-20, pp. 57-58.
[33] R. Doc. 7-20, pp. 60-61.
[34] R. Doc. 7-20, pp. 63-69.
[35] R. Doc. 7-20, pp. 80-81.
[36] R. Doc 7-20, pp. 103-134.
[37] R. Doc. 7-20, pp. 137-142.
[38] R. Doc. 7-20, p. 145.
[39] R. Doc. 7-21, pp. 3-27.
[40] R. Doc. 7-21, pp. 29-31.
[41] R. Doc. 7-21, pp. 53-56.

that the trial court erred in allowing Petitioner's prosecutorial misconduct claim to proceed and erred because it made factual determinations on procedural objections.[42]

On April 6, 2018, the First Circuit denied both the state's writ applications.[43] The state sought a combined writ of certiorari with the Louisiana Supreme Court. The Louisiana Supreme Court granted the state's writ on June 18, 2018 (in pertinent part):

> Granted. Defendant's complaint regarding the seating of the now-deceased juror fails to allege a claim which, if established, would entitle him to relief. La.C.Cr.P. art. 928. *See also Burton v. Johnson*, 948 F.2d 1150, 1156 (10th Cir. 1991)("A party who seeks a new trial because of non-disclosure by a juror during voir dire must show actual bias, either by express admission or proof of specific facts showing a close connection to the circumstances at hand that bias must be presumed"). In addition, defendant has failed to show the state withheld material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Therefore, we grant the State's application to vacate the district court's ruling setting this matter for an evidentiary hearing and we remand for further proceedings consistent with this ruling.[44]

Petitioner sought rehearing, which was denied on September 21, 2018.[45] He then filed his federal application for habeas corpus relief in this Court on October 11, 2018. An evidentiary hearing on Claims 1 and 2 followed.[46]

## IV.    PETITIONER'S APPLICATION IS TIMELY UNDER U.S.C. § 2244(D)(1)(A)

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes a one-year statute of limitations for the filing of federal habeas corpus applications. The one-year statute of limitations is tolled under 28 U.S.C. § 2244(d)(2) for the time during which a properly filed

---

[42] R. Doc. 7-21, pp. 60-86.
[43] R. Doc. 7-21, p. 58; R. Doc. 7-21, p. 1.
[44] R Doc. 7-22, pp. 14-16.
[45] R. Doc. 7-22, p. 66.
[46] The Order and Reasons granting an evidentiary hearing as to Claims 1 and 2 explains that the Louisiana Supreme Court's decision dismissing Petitioner' juror bias and prosecutorial misconduct claims without any factual determination as to whether Juror Mobley may have had actual or implied bias in this case was contrary to clearly established federal law.  R. Doc. 20.

application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending.

Two questions must be answered to determine whether Petitioner's federal habeas application is timely under U.S.C. § 2244(d)(1)(A). First, is whether Petitioner's writ to the First Circuit after the trial court's denial of PCR application 1 remained "pending," such that it tolled the statute of limitations. Second, is whether the PCR application 2 was timely, and thus "properly filed," so that it tolled the statute of limitations.  Because the answer to both questions is "yes," Petitioner's federal habeas application is timely and must be reviewed on the merits.

### A.  PCR Application 1 - March 26, 2009

Respondents contend that Petitioner's writ to the First Circuit seeking review of the trial court's denial of PCR application 1 did not toll the statute of limitations because it was improperly filed due to Petitioner's failure to attach required documents. In *Leonard v. Deville*,[47] the Fifth Circuit clarified the terms "properly filed" and "pending" as used in § 2244(d)(2). Noting that the petitioner's post-conviction relief application was properly filed at the trial court under the applicable rules for filing state applications for post-conviction relief, the court cited an opinion from the Second Circuit for the proposition that "once it is determined that the initial habeas application was 'properly filed,' the 'properly filed' inquiry comes to an end."[48] "Because Leonard's PCR application was 'properly filed,' it …tolled the federal limitations period under § 2244(d)(2) as long as it remained 'pending.'"[49] The Fifth Circuit then explained that the application for post-conviction relief remains "in continuance" and "pending" if it never reaches an "untimely status."[50]

---

[47] 960 F.3d 164 (5th Cir. 2020).
[48] *Id.* at 172.
[49] *Id.* at 168. It was uncontested that Leonard's original PCR application was properly filed.
[50] *Id.* at 169-172.

Guided by *Leonard*, Petitioner's PCR application 1 tolled the statute of limitations if it was "properly filed" with the state trial court and remained "pending" or "in continuance" until the completion of the appellate process. Petitioner's conviction became final on January 22, 2009, ninety days after the Louisiana Supreme Court denied his direct appeal on October 24, 2008.[51] Petitioner filed PCR application 1 with the trial court approximately two (2) months later--on March 26, 2009.[52] There is nothing in the record to suggest PCR Application 1 was improperly filed. The application was filed within two years of the date Petitioner's conviction became final under La. Code Crim. Proc. art. 930.8[53] and the state opposed Petitioner's claims on the merits.[54]

The trial court denied PCR application 1 on September 7, 2011, and denied Petitioner's *Motion for Reconsideration* on September 13, 2011.[55] After Petitioner requested a return date, the trial court entered an order on September 27, 2011, setting the return date as "within the time delays provided by law."[56] Louisiana's Uniform Rules, Courts of Appeal, Rule 4-3 sets a maximum delay of thirty (30) days from when notice issued in civil cases and thirty (30) days from when the order is signed in criminal cases. According to the Louisiana Supreme Court, post-conviction proceedings are a hybrid of criminal and civil proceedings.[57] Petitioner filed his brief with the First Circuit on October 4, 2011,[58] which was twenty-seven (27) days after the trial court order was signed denying PCR application 1; twenty-one (21) days from when the trial court order was signed denying his Motion for Reconsideration; and nineteen (19) days from when the notice

---

[51] *Roberts v. Cockrell*, 319 F.3d 690, 694 (5th Cir. 2003).

[52] R. Doc. 7-12, pp. 6-69.

[53] Petitioner filed a direct appeal with the First Circuit after receiving additional time on the grounds that his counsel failed to timely appeal despite Petitioner's instruction.

[54] R. Doc. 7-14, pp. 97-118. Respondent also did not originally challenge the timeliness of Petitioner's application in this Court but raised the issue in a supplemental brief by order of the Court.  R. Docs. 14, 15.

[55] R. Doc. 7-15, pp. 47, 54.

[56] R. Doc. 7-15, p. 131.

[57] *State v. Harris*, 2018-1012 (La. 7/9/20), ---So.3d---; 2020 WL 3867207, at *5 (La. 7/9/20).

[58] R. Doc. 7-16, pp. 3-8.

was issued on the order denying PCR application 1 and his *Motion for Reconsideration*.[59] Under any interpretation of Rule 4-3, Petitioner's writ application to the First Circuit was timely. The record also reflects that the First Circuit did not reject Petitioner's application as untimely.

The First Circuit denied Petitioner's application "on showing made" on January 17, 2012.[60] Pursuant to Louisiana Supreme Court Rule X, an application to review a judgment of a court of appeal "shall be made within thirty days of the mailing of the notice of the original judgment of the court of appeal." Petitioner filed his *pro se* brief with the Louisiana Supreme Court on February 9, 2012, twenty-three (23) days after the First Circuit denied his writ application.[61] The Louisiana Supreme Court issued an order on October 8, 2012, denying Petitioner's request for review.[62] Accordingly, Petitioner's PCR application 1 never fell into "untimely status," such that it remained "in continuance" and "pending" until October 8, 2012.

### B. PCR Application 2 – May 5, 2013

Respondents also contend that Petitioner's PCR application 2 does not toll the statute of limitations because it was untimely, and thus "improperly filed." "[A]n application is 'properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings."[63] The timeliness of Louisiana applications for post-conviction relief are governed by La. Code Crim. Proc. art. 930.8, which generally provides a two-year time limit from the finality of the conviction. An application filed more than two years after the conviction is final can be considered if the petitioner proves (or the state admits) that the facts upon which the claim

---

[59] The Notice from each Order is dated September 15, 2011. R. Doc. 7-15, pp. 53, 55.
[60] R. Roc. 7-16, p. 2. Respondents' argument that *Leonard* is distinguishable because Petitioner was not provided with a date to refile his writ application, is unpersuasive. Once the First Circuit denied Petitioner's writ application, he correctly and timely proceeded to the next step of the appellate process by filing a writ application with the Louisiana Supreme Court.
[61] R. Doc. 7-16, p. 45.
[62] *State ex rel. v. Granier,* 98 So.3d 868; 2012-0386 (La. 10/8/12).
[63] *Leonard,* 960 F.3d at 168.

11

is predicated were not known to the petitioner or his prior attorneys despite the exercise of diligence given the petitioner's circumstances.

Petitioner asserts that the facts upon which his juror bias claim is predicated were unknown to him or his previous attorneys until April 17, 2013, which is the date that his investigator interviewed Juror Mobley,[64] and that the facts of his prosecutorial misconduct claim were unknown to him or his previous attorneys prior to the November 2, 2017 evidentiary hearing when the prosecutor's cross-examination of Petite caused the trial court to question whether the state was aware during voir dire of Juror Mobley's son's connection to the case.[65]

Respondents argued to the trial judge that PCR application 2 was untimely under article 930.8 because the documents related to Samuel Mobley's connection to the investigation were provided in pretrial discovery. Particularly, on December 16, 2018, the state filed a *Supplemental Motion to Dismiss Post Conviction Application*, averring, "the State provided discovery to the defendant prior to the trial on this matter that showed that Sam Mobley was mentioned in the investigation."[66] During the January 16, 2018 hearing on the state's motion, the prosecutor represented to the trial court, "all of this information… was known to the defendant and his lawyers, provided in open file discovery 10 years, whenever the trial was…and that's the basis for our dismissal under 930.8 (A)…"[67] The trial court denied the state's motion to dismiss PCR application 2 as untimely[68] and ordered the state to answer the prosecutorial misconduct claim.

On March 20, 2018 the state filed a *Motion and Order of Recusal*, seeking to recuse the state post-conviction judge.[69] In that motion, the state specifically represented that Petitioner was

---

[64] R. Doc. 7-17, pp. 10-11.
[65] R. Doc. 1, pp. 7-9.
[66] R. Doc. 7-20, pp. 60-61.
[67] R. Doc. 7-20, p. 116.
[68] R. Doc. 7-20, p. 132.
[69] R. Doc. 7-21, pp. 98-102.

12

provided with Samuel Mobley's employment application and the detective notes in pretrial open file discovery.[70] On April 5, 2018, in its *Answer* to Petitioner's prosecutorial misconduct claim, the state *unequivocally* represented that Samuel Mobley's employment application and the detective notes were included in the district attorney's file and were provided to Petitioner during pretrial discovery:

4.

> Justin Granier received a complete copy of the district attorney's file which included the application of employment by Sam Mobley with Delaune's Supermarket **as well as the additional pages of notes concerning the interview of Sam Mobley by the Ascension Parish Sheriff's Office in the year 2001**.[71]

The state's brief to the Louisiana Supreme Court also represented that the employment application and two pages of handwritten notes were provided to Petitioner during pretrial open file discovery.[72] The Louisiana Supreme Court dismissed Petitioner's PCR application 2 for failure to state a claim. The opinion does not mention timeliness of the application.

Thus, PCR application 2 was not rejected by the state courts as untimely under La. Code Crim. Proc. article 930.8. Furthermore, the sworn testimony offered by the state during the federal evidentiary hearing on April 28, 2021 directly contradicts the representations made in the state court filings arguing that PCR application 2 is untimely under article 930.8. Charles Long, who prosecuted the case, testified at the federal evidentiary hearing that his file contained Samuel Mobley's employment application, which was given to him by the Ascension Parish Sheriff's Office, but did **not** contain the police notes on the back of the application.[73] Long testified that the first time he saw the law enforcement notes on the back of the employment application was when

---

[70] R. Doc. 7-21, pp. 100-101.
[71] R. Doc. 7-22, pp. 4-5 (emphasis added).
[72] R. Doc. 7-22, p. 40.
[73] R. Doc. 48, p. 12 ("And, and I want to make absolutely clear. My file had in it a one-page application, with, with the, with Mr. Mobley's address and whatever the store had. It had no detective notes on it."). Samuel Mobley's employment application can be found at R. Doc. 7-27, p. 106, the police notes are at R. Doc. 7-27, pp. 107-108.

13

counsel for Petitioner presented it at the trial court evidentiary hearing [November 4, 2017].[74] Long further testified that the first time he saw law enforcement notes from the interview with Delaune [owner of Delaune's grocery's store] was right before he faxed the document to counsel for Petitioner on December 4, 2017.[75]

Sandra Capone, felony assistant for the District Attorney's Office, also testified at the federal evidentiary hearing that she sent discovery to both of Petitioner's lawyers in this case, Susan Jones and Petite.[76] Prior to her testimony, Capone reviewed the District Attorney's file. Samuel Mobley's employment application was included in the file, but without any police notes on the back.[77] Capone does not have any recollection of Mobley's employment application before it became an issue, but based on her usual practices, she would have personally copied the entire District Attorney file and provided it to Petitioner's attorney, which would have included the application, but not the police notes on the back.[78]

According to the testimony of Capone and Long, only the front of Samuel Mobley's employment application was produced to Petitioner's trial counsel in open file discovery. This document contains Mobley's name and his grandmother's address.[79] There is nothing on this document that would tie Mobley to the investigation of the murder of Lucas Villar or to Juror Gladys Mobley. The critical documents on this point are the interview notes with Delaune,[80] which show that the owner of the grocery store identified Mobley to law enforcement, and the interview notes with Mobley, which identify Gladys Mobley as his mother and list her address.[81]

---

[74] R. Doc. 48, pp. 13-14; 35.
[75] R. Doc. 48, p. 38.  The fax cover sheet is dated December 4, 2017.  R. Doc. 7-27, p. 105.
[76] R. Doc. 48, pp. 122-23.
[77] R. Doc. 48, pp. 123-24.
[78] R. Doc. 48, p. 131 (acknowledging that she did not recall seeing handwritten notes associated with the employment application prior to 2017).
[79] R. Doc. 7-27, p. 106.
[80] R. Doc. 7-27, p. 108.
[81] R. Doc. 7-27, p.107.

The employment application, by itself, does not reference Gladys Mobley and would not be sufficient to put someone on notice that Juror Mobley might be a biased juror. The sworn testimony at the federal evidentiary hearing established that Petitioner did not receive the law enforcement notes in pretrial open file discovery from the district attorney's office. Indeed, the state prosecutor testified that the first time he saw the notes from the interview with Samuel Mobley was during the state evidentiary hearing on November 2, 2017 and the first time he saw the notes from the interview with Mark Delaune was December 4, 2017. According to the evidence from the hearing in this Court, the facts upon which Petitioner's juror bias claim is predicated were not known to him or his prior attorneys before Juror Mobley was interviewed by Petitioner's investigator on April 17, 2013.[82]

The trial court found the claim regarding Juror Mobley to be timely,[83] and the Louisiana Supreme Court did not dismiss Petitioner's juror bias claim as untimely. The sworn testimony and evidence provided during the federal evidentiary hearing likewise lead to the conclusion that Petitioner's juror bias claim in PCR application 2 was timely under article 930.8.

The state court record also supports the conclusion that Petitioner first began to suspect the state may have known during voir dire that Gladys Mobley's son had a connection to the murder investigation during the November 2, 2017 evidentiary hearing. In fact, it was the trial court that raised concerns about the prosecution's possible knowledge during voir dire based on the questions posed to Petitioner's trial counsel on cross-examination.[84] Petitioner's allegations about the prosecution's knowledge appeared to be more than speculation considering the state's repeated assertions during the post-conviction proceedings that the documents tying Samuel Mobley to the

---

[82] R. Doc. 7-17, pp. 10-11.
[83] R. Doc. 7-20, p. 132.
[84] R. Doc. 7-20, pp. 38-51.

15

investigation and to Gladys Mobley were provided to Petitioner in open file discovery. Although the testimony at the federal evidentiary hearing established that the state was incorrect in this assertion, this information is sufficient to meet Petitioner's burden that the prosecutorial misconduct claim is also timely.[85]

Nor does the record establish that Petitioner failed to act with "diligence" under article 930.8(A)(1). Respondent's argument, that Petitioner could have discovered the law enforcement notes because they were in the Ascension Parish Sheriff's Office's files, is not persuasive. The testimony at the federal evidentiary hearing established that the version of the Ascension Parish Sheriff's Office file that was produced by the district attorney's office in open file discovery only included the front side of Samuel Mobley's employment application. As discussed above, there is no information included on this document that would indicate Mobley's connection to the investigation or that should have triggered any additional "diligence" by Petitioner or his counsel.[86]

Lastly, the implications of the misrepresentations made by the State of Louisiana with respect to the documents produced to Petitioner during open file discovery cannot be ignored. In addition to the multiple statements in state court filings, Respondents' brief to this Court represented:

> …the record reflects that petitioner's trial counsels were provided open file discovery which included ***all material in the Sheriff's***

---

[85] Respondent's brief (R. Doc. 49, p. 12) incorrectly characterizes Maria Dunnigan's testimony as stating that she received the Sheriff's office files with the relevant documents in 2012. Ms. Dunnigan testified that she first attempted, through a public records request, to obtain the files in 2012 but was unsuccessful. It was not until a second records request in 2015 that Ms. Dunnigan received access to the files. R. Doc. 48, pp. 108-117.

[86] The letter provided by the district attorney with open file discovery (R. Doc. 33) directed Petitioner's counsel to the arresting agencies' files for items "which may be mentioned but not physically present in the District Attorney's file." There was nothing "mentioned" on Samuel Mobley's employment application that would have led any reader to suspect he was interviewed by the Ascension Parish Sheriff's Office. Despite the state's arguments that Petitioner should have discovered Samuel Mobley's connection to the investigation sooner, the prosecutor's testimony at the evidentiary hearing is reflective of reasonable diligence under these circumstances. Long testified that there were four employment applications from Delaune's employees in his file. One of those applications was Samuel Mobley's, but he had no idea Samuel Mobley was Gladys Mobley's son. R. Doc. 48, p. 57. Long did not review the Ascension Parish Sheriff's Office's files before Petitioner's trial and only did so two (2) days before the federal evidentiary hearing. R. Doc. 48, pp. 59, 65.

> ***Office investigation file***. This file included Sam Mobley's employment record ***and the investigating officer's interview with Sam Mobley***…Petitioner has failed to adduce a scintilla of evidence that the information now complained of was not known to or should have been known by his counsel during voir dire.[87]

Significant state and federal court resources were expended on the issue of whether Petitioner's PCR application 2 was timely, only to have the testimony from the federal evidentiary hearing establish that these many representations made by the state were, at best, incorrect. Fundamental fairness is the central concern of the writ of habeas corpus and the search for the truth cannot be obstructed, regardless of malice.[88]

Having determined that both PCR applications were timely, we now turn to the calculation of the timeliness of Petitioner's federal habeas petition. After a ruling by the state's highest court on direct appeal, a petitioner's judgment becomes final when the Supreme Court issues a decision denying discretionary review or, if no application for review is made, upon the conclusion of the ninety (90) day period for seeking such review.[89] The Louisiana Supreme Court denied Petitioner's direct appeal on October 24, 2008. He did not seek review with the United States Supreme Court, so that his conviction became final on January 22, 2009.

A total of sixty-four (**64**) untolled days passed until Petitioner filed PCR application 1 on March 26, 2009. As discussed above, PCR application 1 remained "in continuance" and "pending" until the Louisiana Supreme Court denied Petitioner's writ application on October 8, 2012. Eighteen (**18**) days of untolled time elapsed from Petitioner's discovery of the possible juror bias claim at the April 17, 2013 interview with Juror Mobley and the filing of PCR application 2 on May 5, 2013. Forty-two (**42**) days of untolled time elapsed from Petitioner's discovery of a

---

[87] R. Doc. 6, p. 27 (emphasis added).
[88] *Dretke v. Haley*, 541 U.S. 386, 393 (2004), citing *Strickland v. Washington*, 466 U.S. 668, 697 (1984).
[89] *Roberts*, 319 F.3d at 694.

possible prosecutorial misconduct claim at the state court evidentiary hearing on November 2, 2017 and Petitioner's amendment of PCR application 2 to add that claim on December 14, 2017. PCR application 2 remained pending until rehearing was denied by the Louisiana Supreme Court on September 21, 2018. An additional twenty (**20**) days passed until Petitioner filed the instant federal habeas petition on October 11, 2018, resulting in a total of **144** untolled days. As less than a year elapsed, Petitioner's application is timely.[90]

## V.    MERITS REVIEW

Because the December 30, 2020 *Order and Reasons,*[91] determined that the state court's summary dismissal of Petitioner's claims for juror bias (Claim 1) and prosecutorial misconduct (Claim 2) were contrary to clearly established federal law, a *de novo* review of these claims is conducted based on the state court record and the testimony received at the April 28, 2021 evidentiary hearing in this Court.[92]

### A.  Claim 1: Juror Bias

Clearly established federal law provides relief for both actual and implied juror bias. Actual bias can be shown through admission or factual proof and "exists when a juror fails to answer a material question accurately because he is biased."[93] "T[he United States Supreme Court] has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the

---

[90] Claim 1 and Claim 2 are also timely under U.S.C. § 2244(d). Two hundred nine (**209**) days of untolled time passed between the finality of the judgment as to PCR application 1 and the filing of PCR application 2. As a properly filed and pending application tolls the time period for filing a federal habeas application, only two hundred ninety-three (**293**) days of untolled time passed.

[91] R. Doc. 20.

[92] When *Cullen v. Pinholster's* limitation on federal evidentiary hearings does not apply, the state court decision is no longer entitled to deference and the district court is entitled to resolve the claim without the deference normally required under AEDPA. 563 U.S. 170 (2011) and *see, Smith v. Cain*, 708 F.3d 628, 635 (5th Cir. 2013).

[93] *United States v. Thomas*, 627 F.3d 146 (5th Cir. 2010).

opportunity to prove actual bias."[94] To demonstrate actual bias, "admission or factual proof" of bias must be presented.[95]

Petitioner alleges that Juror Mobley was actually biased because she did not disclose during voir dire her son's involvement in the murder investigation that was the subject of the case.[96] Specifically, Petitioner points to Juror Mobley's response to the question of whether she had heard or read about the murder at Delaune's Supermarket:

> I just—I don't even remember what all I read, but I did read it in the newspaper, what had happened, and the news on TV, but, you know, I haven't—you know, I couldn't have formed an opinion.[97]

Petitioner attempts to establish Juror Mobley's implied bias because her son was the same age as the victim and worked at the same grocery store where the murder was committed.[98] Petitioner also alleges that Juror Mobley was impliedly biased because Juror Mobley's son was read his *Miranda* rights and questioned by the police as a potential suspect in the murder,[99] his father's house was searched by the police, and Juror Mobley's house was searched by the police.[100]

### 1. Petitioner Cannot Establish Actual Juror Bias

The testimony of the investigating officers provided at the federal evidentiary hearing, which is found to be a credible and reasonable account of the nature and extent of law enforcement's contact with Samuel Mobley during the Lucas Villar murder investigation, does not bear out Petitioner's juror bias claims. Chris Fontenot ("Fontenot") and Mike Toney ("Toney), detectives with the Ascension Parish Sheriff's Office, who investigated the Lucas Villar murder, testified at the federal evidentiary hearing.

---

[94] *Smith v. Phillips,* 455 U.S. 209 (1982).
[95] *United States v. Bishop,* 264 F.3d 535, 554 (5th Cir. 2001).
[96] R. Doc. 1, pp. 18-19.
[97] R. Doc. 7-5, p.112.
[98] R. Doc. 1, pp. 18-19; R. Doc. 50, p. 18.
[99] R. Doc. 50, p. 18.
[100] R. Doc. 50, pp. 21-22.

Fontenot testified that he arrived on the scene at approximately 6:30 a.m.[101]    Fontenot interviewed Delaune, the owner of the store where the murder was committed.[102] In response to questioning about whether anything had happened at the store lately, Delaune mentioned two things.  One was Samuel Mobley, a former employee who had been fired, and the other was a possible shoplifter about two weeks prior.[103]    According to Fontenot, Mobley, and the other individual identified by Delaune, would be characterized as persons of interest, or less, rather than suspects.[104] Fontenot was not tasked to follow up with Mobley or the other individual, and did not know at the time whether another officer followed up with regard to these persons of interest.[105]

Toney testified that Fontenot gave him Samuel Mobley's employment application with the Laurel Ridge Road address.[106]  Toney went to that address and spoke with Mobley, whom Toney also characterized as a person of interest.[107] Toney took notes of the interview, which indicate that Mobley told him that his mother's name was Gladys Mobley, and her address was on Daigle Road.[108]  Mobley did not live with Juror Mobley. Further investigation into Samuel Mobley ended after the interview and Gladys Mobley's home was never searched because Mobley did not give Detective Toney any reason to believe he was involved in the murder, and because suspects, including Petitioner, were in custody by early afternoon.[109]

The only testimony from Samuel Mobley is from the state court evidentiary hearing.  After determining that he was competent to offer testimony,[110] he was questioned in chambers. Mobley

---

[101] R. Doc. 48, p. 134.
[102] Id.
[103] R. Doc. 48, p. 135.  In fact, Fontenot testified that Samuel Mobley was never a suspect in the Lucas Villar murder investigation.  R. Doc. 148, p. 143.
[104] R. Doc. 48, p. 139.
[105] Fontenot later learned that law enforcement did talk to Samuel Mobley.  R. Doc. 48, p. 141-142.  Fontenot identified the notes at R. Doc. 27, p. 108 as his notes on the back of the employment application from his interview with Delaune.
[106] R. Doc. 48, p. 146.
[107] R. Doc. 48, p. 147.
[108] R. Doc. 48, p. 148.
[109] R. Doc. 148, pp. 149-152.
[110] R. Doc. 7-19, p. 132.

testified that he only worked at Delaune's Supermarket for about an hour before he was fired.[111] He was living with his father and grandmother at the time, not with his mother.[112] A dozen officers showed up in plain clothes at his grandmother's residence to question him, and they searched his grandmother's house.[113]  When questioned by the trial court, Mobley testified that he did not see his mother often, approximately every six months.  He also thought law enforcement officers went to his mother's house first and then came to his grandmother's house. Mobley seems to suggest that Juror Mobley told him the officers came to her house too, but he could not say when that occurred.[114]

Reviewing all the evidence, Samuel Mobley's account of the nature and extent of his involvement in the Lucas Villar murder investigation is unreliable. Mobley testified that a "dozen" officers showed up at his home on Laurel Ridge Road to question him. Toney testified that it is likely, based on department policy, that he was not alone when he went to Mobley's home, but a dozen officers were not on duty at the time he questioned Mobley.[115] The most telling indication that Mobley's account is unreliable is Mobley's version of the sequence of events. Mobley testified that officers searched his mother's home in Prairieville *before* they arrived at the house on Laurel Ridge Road in St. Amant. Considering Fontenot and Toney's testimony about how the investigation unfolded, this testimony is implausible. Mobley's Laurel Ridge Road address is the address on the Delaune's Supermarket employment application that was provided to police by Delaune the morning of the murder.  Toney testified he travelled to the address on Laurel Ridge Road because that was Mobley's address on the employment application. Toney's account is a

---

[111] R. Doc. 7-20, pp. 10-11.
[112] R. Doc. 7-20, pp. 11-12.
[113] R. Doc. 7-20, pp. 16-17.
[114] R. Doc. 7-20, pp. 19-20.
[115] R. Doc. 48, p. 149.

logical chain of events. As reflected in Toney's notes, Mobley provided Toney with his mother's address when Mobley was questioned at his home on Laurel Ridge Road. It does not make sense that the police would travel to Juror Mobley's home address, which was not on the Sam Mobley's employment application, to search a home where Sam Mobley did not live before they travelled to Mobley's home address listed on the employment application to question him about an incident that happened at his former place of employment.[116]

Notably, Mobley never testified during the state court evidentiary hearing that he told his mother he had been questioned by police. While it appears that the trial court during the state court evidentiary hearing was operating under the assumption that Juror Mobley told Petitioner's investigator, Brad Scott ("Scott"), that her son had been questioned by the police,[117] Scott's affidavit does not expressly state that Juror Mobley knew her son had been questioned by the police or that she relayed this information to Scott. The affidavit makes a blanket statement that Samuel Mobley was questioned by the police but does not reveal the source of the information.[118] Neither party called Scott or Samuel Mobley as a witness at the federal evidentiary hearing.

The burden of proof is on the petitioner in a habeas corpus proceeding.[119] To demonstrate actual juror bias, "admission or factual proof" of bias must be presented.[120] To obtain a new trial due to a juror's alleged failure to answer questions honestly during voir dire, a habeas petitioner must show that the complained-of juror failed to provide an honest answer to a material question and that a truthful response would have provided a valid basis to challenge the juror for cause.[121]

---

[116] In making this determination, the undersigned also considered the leading nature of the questions posed to Samuel Mobley that elicited the testimony that his mother's home had been searched by police compared to the non-leading and detailed sequence of events provided by Fontenot and Toney at the federal evidentiary hearing.

[117] R. Doc. 7-20, pp. 5-6; 50-51; *see also*, Order on Petitioner's Notice of Intent to Use Hearsay and Non-Hearsay Testimony in Support of Petitioner's Application for Post-Conviction Relief. R. Doc. 7-18, pp. 41-42.

[118] R. Doc. 7-17, pp. 10-11, ¶ 7.

[119] *Jones v. Estelle*, 632 F.2d 490, 492 (5th Cir. 1980); *Baldwin v. Blackburn*, 653 F.2d 942, 947 (5th Cir. 1981).

[120] *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir.2001).

[121] *Green v. Quarterman*, 213 F. App'x 279, 281 (5th Cir. 2007).

Petitioner has failed to establish actual juror bias as to Juror Mobley. While Petitioner established that Samuel Mobley was questioned by the police as a person of interest in connection with the murder investigation, Petitioner failed to prove that Juror Mobley knew this fact when she served as a juror during Petitioner's trial.

### 2.  Petitioner Cannot Establish Implied Juror Bias

The decisive question for implied bias is whether Juror Mobley "had a close relationship with one of the important actors in the case," or the facts underlying her alleged implied bias are such that they "would inherently create…a substantial emotional involvement, adversely affecting impartiality."[122] For the same reasons Petitioner's actual bias claim fails, he cannot meet the first test for implied bias—Petitioner has failed to establish that Juror Mobley had a close relationship with an important actor in the case.  Petitioner has also failed to meet his burden that Gladys Mobley had a substantial emotional involvement, adversely affecting impartiality. The only evidence on this point is Scott's affidavit, which references that Juror Mobley stated during his interview with her that "It could have been my son," or words to that effect, because her son worked at the supermarket where the murder occurred and was the same age as the victim.[123] This is not the type of substantial emotional involvement that courts are concerned would adversely impact a juror's impartiality.[124] Accordingly, Petitioner's implied bias claim also fails.

---

[122] *See, Solis v. Cockrell*, 342 F.3d 392, 398-99 (5th Cir. 2003) (noting "carefully watched limits" on the implied bias doctrine).

[123] R. Doc. 7-17, p. 10, ¶ 8.

[124] *Brooks v. Dretke*, 418 F.3d 430 (5th Cir. 2005) (juror arrested for carrying a gun in the courtroom was found to have implied bias because he could have been charged with a felony by the same prosecutor); *United States v. Scott*, 854 F.2d 697 (5th Cir. 1988) (implied and actual bias found due to juror's failure to disclose in voir dire that his brother was a law enforcement officer in one of the agencies that investigated the defendant's case); *McCurtis v. Michaels*, No. 04-1166, 2006 WL 3240762, at *8 (W.D. La. Oct. 3, 2006) (finding implied bias where juror knew both the defendant and the victim and was related by marriage to the victim's boyfriend because juror's entanglement with parties in the case "inherently create[d] in a juror a substantial emotional involvement, adversely affecting impartiality.") (citation omitted); *but see United States v. Wilson*, 116 F.3d 1066, 1087 (5th Cir. 1997) (reversed in part on other grounds) ("friendship with the victim of a defendant's alleged crime does not, standing alone, justify a finding of bias.").

### B. Claim 2: Prosecutorial Misconduct

In Claim 2, Petitioner contends that prosecutorial misconduct violated his due process rights because the state knew during voir dire that Juror Mobley had a connection to the investigation such that she might be biased, but failed to disclose this information to the defense or the trial court.[125] While prosecutorial misconduct for failure to disclose known juror bias has been recognized by the Supreme Court as implicating the right to a fair and impartial jury and due process,[126] Petitioner's prosecutorial misconduct claim is predicated on a valid juror bias claim. Because Petitioner failed to establish that Juror Mobley was biased, Claim 2 also fails.

### C. Claim 3 and Claim 4

#### a. Claim 3: Improper Jury Charges and Comments on the Evidence

In Claim 3 Petitioner contends the jury instructions, combined with the judge's improper comments about the instructions, improperly misled the jury to believe the only options for a verdict were "guilty" or "not guilty" of second degree murder. Petitioner supports his contention with an affidavit from one juror.[127] Petitioner raised this claim in PCR application 1, which was denied by the trial court, as follows:

> In Claim 8, Petitioner asserts that the judge improperly instructed the jury regarding the definition of manslaughter. Petitioner asserts that during deliberations the jury sent a note which the judge determined to be a request for a clarification of the instructions on manslaughter. The judge then read the definition of manslaughter and gave an example of an enumerated felony, the example being that of armed robbery. Petitioner argues that the judge's example was an improper comment on the evidence in that the judge suggested that the facts supported an armed robbery such that the jury could not return a verdict of manslaughter. Louisiana Code of Criminal Procedure article 722 prohibits the judge from commenting on the facts

---

[125] R. Doc. 1, pp. 20-21.

[126] *Williams v. Taylor*, 529 U.S. 420, 442 (2000); *Donnelly v. DeChristoforo*, 416 U.S. 637, 648 (1974).

[127] In considering this claim, only the affidavit of Juliet Raffray, which was presented to the trial court with PCR application 1, was considered. R. Doc. 7-15, pp. 40-41. The other submitted affidavits (Amy Knott and Ronald Bates) were attached to PCR application 2. Because this claim was dismissed as successive, by the state court, consideration of these affidavits would be an improper expansion of the state court record. *See*, *Pinholster*, 563 U.S. at 181-82 (review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits).

of the case, either by commenting upon the evidence or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted in the presence of the jury. As noted by the State in its Answer, notwithstanding this rule, the trial judge is permitted to instruct the jury on the applicable law even through an illustration or example that may be pertinent to the particular case. If the example given is legally correct, "the fact that the evidence in the case properly brought it under the illustration given cannot be urged as a comment by the trial judge on the evidence or as furnishing to the jury any conclusion on his part as to the guilt or innocence of the accused." *State v. Deboue*, 522 So.2d 355, 362 [sic, 552 So.2d 355]. The example given by the judge was legally correct and did not amount to a comment on the evidence as to the determination of which responsive verdict Petitioner's conduct fell into was left to the jury. The judge also did not improperly instruct the jury as armed robbery is one of the enumerated felonies made reference to in the definition of manslaughter. Consequently, this claim is also without merit.[128]

After the jury submitted a request for clarification of the definition of "manslaughter," the record reflects that the trial judge specifically instructed the jury that there was an option of three verdicts, stating: "So, now again, I instruct you that when 10 or more of you agree upon one of these three verdicts, which is "guilty as charged," "guilty of manslaughter," or "not guilty" you notify the bailiff and let me know…"[129]

A trial judge's comments violate due process "only if the judge appears to predispose the jury toward a finding of guilt or to take over the prosecutorial role."[130] In considering Petitioner's PCR application, the state court determined that the judge's clarification of the jury instructions was a correct statement of Louisiana law and was not improper under the circumstances. Contrary to Petitioner's contentions, the record reflects that the trial judge specifically instructed the jury that manslaughter was a responsive verdict. Petitioner has not shown that the state court decision rejecting this claim was contrary to, or an unreasonable application of, federal law.[131]

---

[128] R. Doc. 7-15, pp. 44-45.

[129] R. Doc. 7-9, p. 60.

[130] *Derden v. McNeel,* 978 F.2d 1453, 1459 (5th Cir.1992); *see also Cotton v. Cockrell,* 343 F.3d 746, 754 (5th Cir. 2003).

[131] Unlike Claims 1 and 2, Claim 3 is subject to the deferential standard of review under AEDPA. "Relief lies under section 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on

### b. Claim 4: Ineffective Assistance of Counsel/ Confrontation Clause

In Claim 4, Petitioner alleges that his trial counsel was ineffective for failing to move for a mistrial when the state failed to call two witnesses to testify that were promised in the prosecutor's opening statement, and for failing to object to hearsay testimony from two prosecution witnesses. Specifically, Petitioner complains that the prosecution said in its opening statement it would call Josh Barrow, who would testify he was with Petitioner before the murder. The prosecutor also told the jury during its opening statement it would call Nick Babin, who would testify that Petitioner instructed him to dispose of one of the guns. Petitioner contends that his trial counsel should have moved for a mistrial when the prosecution rested its case without calling Babin or Barrow to testify.

Petitioner also claims his counsel should have objected to hearsay testimony from prosecution witnesses Mike Toney and Benny Delaune. Petitioner points to testimony from Toney recounting a conversation between Petitioner and Barrow in jail during which Petitioner told Barrow to "dispose of the 30-30 weapon."[132] Also, Petitioner points to hearsay testimony from Delaune, who said an unidentified witness, "saw Mr. Granier, I believe…transferring some weapons from a trunk and I believe one of them was a rifle with a scope on it I believe."[133]

---

a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts"; or (2) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. 362, 413 (2000); *see also White v. Woodall,* 572 U.S. 415, 419 (2014); *Thaler v. Haynes,* 559 U.S. 43, 47 (2010); *Bell v. Cone,* 535 U.S. 685, 698 (2002); *Early v. Packer,* 537 U.S. 3, 7–8 (2002).

[132] R. Doc. 7-6, p. 119. The Petitioner also complains about Toney's testimony found at R. Doc. 7-7, p. 80 confirming that during the same conversation, Petitioner told Barrow, "If you get out, the 30-30 at Nick's house. Go get rid of it."

[133] R. Doc. 7-7, p. 91.

Petitioner raised his ineffective assistance of counsel claim in PCR application 1.[134] The claim regarding his counsel's failure to move for a mistrial was denied by the trial court based on trial counsel's testimony at the evidentiary hearing on the claim:

> ...Mr. Petite acknowledged that the most damaging evidence in his case were the three (3) statements /confessions of his client and the focus of his defense was to have his client explain the statements. He further indicated that he was aware that he could have called the witnesses to testify, but he believed that they would have offered testimony buttressing the most damaging of the confessions and preferred not having their direct testimony as part of his trial strategy. Accordingly, this claim has no merit.[135]

The trial court also dismissed Petitioner's claim regarding his counsel's failure to object to hearsay testimony from Detectives Toney and Delaune:

> ...Petite testified that in light of his client's three (3) prior inconsistent statements, his strategy was to allow the jury to hear the voice of Granier and have him explain the circumstances surrounding the statements and hopefully, have the jury believe the least culpable of them. It is apparent to this Court that Petite's failure to object to any hearsay was within his sound trial strategy. Accordingly, this claim has no merit.[136]

To establish that his legal representation at trial fell short of the assistance guaranteed by the Sixth Amendment, a convicted defendant must meet the two-pronged test set forth by the Supreme Court in *Strickland*.[137] The defendant must show that his counsel's performance was both deficient (that counsel did not provide reasonably effective assistance under prevailing professional norms) and prejudicial (that errors by counsel "actually had an adverse effect on the defense").[138] The former component of the test authorizes only "highly deferential" judicial scrutiny, requiring the defendant to overcome the presumption that, under the circumstances, the

---

[134] Petitioner initially raised the claim in his direct appeal. The First Circuit dismissed the claim on the grounds it was not subject to appellate review and was more proper for post-conviction relief. *See State v. Granier*, 2007-0807 (La. App. 1 Cir. 12/21/07), 2007 WL 4480675.
[135] R. Doc. 7-15, p. 51.
[136] R. Doc. 7-15, pp. 51-52.
[137] 466 U.S. 668 (1984).
[138] *See Anderson v. Collins*, 18 F.3d 1208, 1215 (5th Cir. 1994), citing *Strickland*, 466 U.S. at 686-89, 693.

challenged action might be considered sound trial strategy.[139]  As to the latter component, it is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.  Rather, the defendant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[140]  A court considering a claim of ineffective assistance must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance.[141] The challenger's burden is to show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.[142]

The First Circuit dismissed this claim on direct appeal as more proper for post-conviction relief, but noted in its opinion, "[A]t the conclusion of trial, when it was clear that certain witnesses referred to by the prosecutor were not called, defense counsel could have objected or moved for a mistrial, but failed to do so."[143] In Louisiana "when a prosecutor details evidence in his opening statement which is not subsequently admitted, he takes the risk that a mistrial may have to be granted."[144] The onus was on the prosecutor to call the witnesses referenced in his opening statement in order to avoid the risk of mistrial. It is not clear why the trial court focused on trial counsel's strategy decision not to call witnesses to testify when Petitioner's argument is that counsel should have moved for a mistrial when *the state* failed to call witnesses it promised in opening statements. The reason defense counsel chose not to call Babin and Barrow on his case in chief is irrelevant to the question of why he failed to move for a mistrial. In any event, Petitioner

---

[139] *Anderson*, 18 F.3d at 1215, citing *Strickland*, 466 U.S. at 689.

[140] *Anderson*, 18 F.3d at 1215, citing *Strickland*, 466 U.S. at 693.

[141] *See Harrington v. Richter*, 562 U.S. 86, 104 (2011), citing *Strickland*, 466 U.S. at 689.

[142] *See Harrington*, 562 U.S. at 104, citing *Strickland*, 466 U.S. at 687.

[143] *State v. Granier*, 2007 WL 4480675, at *3, n.5.

[144] *State v. Horne*, 554 So.2d 820, 824 (La. App. 5 Cir. 1989), citing *State v. Bell*, 279 So.2d 164 (La. 1977).

cannot satisfy the second prong of the *Strickland* standard as to this claim: a "reasonable probability" that a mistrial would have been granted.[145]

In Louisiana, the general rule is that, "absent bad faith on the part of the prosecutor or clear and substantial prejudice, the reference in the opening statement to evidence later [not admitted] is not a ground for a mistrial."[146] A "mistrial is a drastic remedy which should only be declared upon a clear showing of prejudice by the defendant."[147] Petitioner does not allege, nor does the record suggest any bad faith by the prosecutor.[148] The jury heard Petitioner's two incriminating statements to the police, albeit with different versions of his involvement.[149] The jury also heard Petitioner admit on cross-examination he dropped Roddy and Barrow off to rob Delaune's, he knew they had guns with them, and he waited in the car while they robbed the store.[150] Every version of events Petitioner told the police and the jury implicated him as a principal to armed robbery where a victim was fatally shot, which subjected him to a second degree murder conviction.[151] Under circumstances where Petitioner admitted to the necessary elements for a conviction, he cannot show "clear and substantial prejudice" based on the prosecution's uncalled

---

[145] Evaluation of the prejudice prong is subject to *de novo* review by this Court. In those instances, in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo. See Rompilla v. Beard,* 545 U.S. 374, 390 (2005) (holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith,* 539 U.S. 510, 534 (2003) (same).

[146] *State v. Green,* 343 So.2d 149, 151 (La. 1977).

[147] *State v. Leonard,* 05–1382 (La. 6/16/06), 932 So.2d 660, 667.

[148] Nick Babin was subpoenaed and present during the trial. R. Doc. 7-6, p. 65. Josh Barrow was subpoenaed by the prosecution, remained incarcerated during the trial, but was available as a witness. *Id.*

[149] In the first statement Petitioner admits to prior knowledge of the armed robbery, but claims he stayed in the car during the murder. R. Doc. 7-13, pp. 9-31; R. Doc. 7-8, p. 30. In the second statement Petitioner admits to intent to commit armed robbery and that he was present in front of the store when Lucas Roddy shot Lucas Villar.  R. Doc. 7-13, pp. 32-47; R. Doc. 7-8, pp. 77-78.

[150] R. Doc. 7-8, pp. 137-139.

[151] "All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La. Stat. Ann. § 14:24. The individual who operates the getaway car is a principal to armed robbery. *See, State v. Brown,* 15-96 (La. App. 5 Cir. 9/15/15), 173 So.3d 1262. Conviction for second degree murder is appropriate when the defendant is a principal to an armed robbery during which a homicide is committed. *See,* *State v. Turner,* 11-870 (La. App. 5 Cir. 3/27/12), 91 So.3d 426.

witnesses. Thus, Petitioner cannot show that a mistrial would have been granted and he fails to satisfy the prejudice prong of the *Strickland* analysis.

Petitioner further contends that his Sixth Amendment rights pursuant to the Confrontation Clause were violated because he was denied the opportunity to confront Josh Barrow and Nicholas Babin due to trial counsel's failure to object to hearsay testimony from Detectives Toney and Delaune about the disposal of one of the guns after the crime and Petitioner's possession of guns prior to the crime. The Confrontation Clause of the Sixth Amendment to the U.S. Constitution provides, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."[152] Petitioner's Confrontation Clause argument on this point also fails. Confrontation Clause errors are subject to harmless error review.[153] Due to Petitioner's inculpatory statements, a Confrontation Clause error, even if established, would have been harmless.[154] While the detectives' testimony is not favorable, due to Petitioner's inculpatory statements and testimony, there is no reasonable probability that the outcome of the trial would have been different had counsel objected.

---

[152] U.S. Const. Amend VI.

[153] *Fratta v. Quarterman*, 536 F.3d 485, 507 (5th Cir. 2008).

[154] To the extent Petitioner argues that trial counsel was ineffective for failing to call Babin and Barrow to testify, counsel testified at the state evidentiary hearing that the decision was strategic. R. Doc. 7-15, p. 102. Counsel testified that Babin "provided some of the most damning and inculpatory evidence against Mr. Granier." R. Doc. 7-15, p. 83. Additionally, Barrow gave two separate statements to police. R. Doc. 7-13, pp. 51-67. Had Barrow testified consistently with his statements, the jury would have heard additional detail regarding Petitioner's participation in the crime. The Confrontation Clause argument was raised by Petitioner in PCR application 1 (R. Doc. 7-12, pp. 35-37), but was not directly addressed by the trial court in its ruling. The opinion does address trial counsel's decision not to call Babin and Barrow as witnesses in the section discussing counsel's failure to move for a mistrial. While not relevant to the mistrial argument, counsel's decision in this respect is relevant to the Confrontation Clause aspect of Petitioner's ineffective assistance of counsel claim. Because the trial court did address the reasoning behind counsel's decision not to call Babin and Barrow and declared it a strategic decision, the *Harrington* presumption applies, and deference is afforded to the trial court's determination that trial counsel was not ineffective for failing to call Babin and Barrow to testify at trial. *See*, *Harrington*, 562 U.S. at 104 (citation omitted) ("A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance.").

## VI.    CERTIFICATE OF APPEALABILITY

Should Petitioner pursue an appeal, a certificate of appealability should also be denied.  An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability."[155]    Although Petitioner has not yet filed a Notice of Appeal, the Court may address whether he would be entitled to a certificate of appealability.[156]  A certificate of appealability may issue only if a habeas petitioner has made a substantial showing of the denial of a constitutional right.[157]  In cases where the court has rejected a petitioner's constitutional claims on substantive grounds, a petitioner must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."[158] In the instant case, reasonable jurists would not debate the denial of Petitioner's application or the correctness of the substantive ruling.  Accordingly, if Petitioner seeks to pursue an appeal in this case, a certificate of appealability should be denied.

## VII.    RECOMMENDATION

As Petitioner has failed to meet his burden to establish the claims brought in his federal habeas application, **IT IS RECOMMENDED** that Petitioner's application for habeas corpus relief be **DENIED** and that this proceeding be **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER RECOMMENDED** that, if Petitioner seeks to pursue an appeal in this case, a certificate of appealability be denied.

Signed in Baton Rouge, Louisiana, on March 11, 2022.

**ERIN WILDER-DOOMES**
**UNITED STATES MAGISTRATE JUDGE**

---

[155] 28 U.S.C. § 2253(c)(1)(A).
[156] *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000).
[157] 28 U.S.C. § 2253(c)(2).
[158] *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005), quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).